UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MARQUETTE TRANSPORTATION COMPANY, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 16-522** |
| **M/V CENTURY DREAM ET AL** | **SECTION "L" (2)** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    PROCEDURAL HISTORY

On January 21, 2016, both the M/V CENTURY DREAM ("CENTURY DREAM") and the M/V JOHN PAUL ECKSTEIN ("JPE") were travelling downbound in the Mississippi River. At or around College Point, an area in the Mississippi River in College Point, Louisiana, the CENTURY DREAM overtook the JPE. Around the time of the overtaking, the JPE became caught in an eddy near the left descending bank and allided with a barge fleet owned by AEP and docked on the left descending bank. This allision caused damage to the JPE's barges and cargo and to AEP's barge fleet. Marquette filed this suit, arguing that the CENTURY DREAM improperly overtook the JPE, causing the allision. The CENTURY DREAM avers its overtaking was proper and the JPE is solely responsible for the allision.

This case came on for a non-jury trial on January 23, 2017, and concluded on January 24, 2017. The Court has carefully considered the testimony of the witnesses, the exhibits entered into evidence, and the entire record, and hereby enters the following findings of fact and conclusions of law. To the extent that a finding of fact constitutes a conclusion of law, the Court adopts it as such. And to the extent that a conclusion of law constitutes a finding of fact, the Court adopts it as such.

## II. FINDINGS OF FACT

### A. The Parties and Vessels

(1)

On January 21, 2016, Marquette Transportation Company, LLC ("Marquette") owned and operated the JPE.

(2)

The JPE is a towing vessel, also known as a line boat, that measures approximately 180' long, 48' wide and 4½ stories high. She has 8,400 horsepower engines.

(3)

On January 21, 2016, Captain Joseph A. Dragon, Jr. ("Captain Dragon") was employed by Marquette as the captain of the JPE.

(4)

On January 21, 2016, the JPE was pushing 17 loaded barges in such a configuration that the total length of the flotilla was 1,180'.

(5)

The 17 barges were configured as depicted in the January 21, 2016, logs of the JPE – *i.e.,* three (3) across and five (5) long, plus two (2) barges made up end-to-end on the port side of the tow and up against the JPE, with the LTD-363 being the forward of the two portside barges.

(6)

At all pertinent times, the Barge LTD-363 was owned under a trust agreement for the benefit of Tohlease Corporation and was part of the flotilla of the JPE.

(7)

At all pertinent times, the Barge ACL-01146 was owned by American Commercial Barge Lines and was positioned in the Belmont Fleet on the outside edge of the most upriver tier of barges.

(8)

Belmont Fleet is located on the left descending bank of the Mississippi River, below College Point, at approximately Mile Marker ("MM") 154 AHP.

(9)

On January 21, 2016, Splendid Fleet Corp. ("Splendid Fleet"), a Panamanian corporation owned the CENTURY DREAM and Hiong Guan Navegacion Co., Ltd. ("Hiong Guan"), a Hong Kong company, managed the vessel.

(10)

The CENTURY DREAM is a 450' bulk carrier.

(11)

On January 21, 2016, the pilot on board, and at the conn of, the CENTURY DREAM was NOBRA Pilot No. 59, Marvin Bowman ("Pilot Bowman").

(12)

The CENTURY DREAM was a light ship with excellent maneuverability; as Pilot Bowman informed Captain Dragon, the ship could go "bank-to-bank," meaning it was easily maneuverable and could be piloted nearly to the edge of each bank of the river. The CENTURY DREAM had a draft of 2.77 meters (9.08 feet) forward and 4.93 meters (16.17 feet) aft.

(13)

At all times pertinent, both vessels were equipped with functioning Electronic Chart Displays manufactured by Rose Point ("Rose Point"), the industry standard, and radio communication equipment, allowing both vessels to contact each other, to know the location of each vessel, and to see where and when the overtaking would occur. The Rose Point navigation systems automatically and objectively record vessel location and movement on a proven industry standard electronic chart.

### B. The Allision

(14)

On the morning of January 21, 2016, two vessels began the day at the same area of the Mississippi River: the CENTURY DREAM was anchored at the Burnside Anchorage, located on the left descending bank of the river just above MM 165 AHP, and the JPE was adjacent to a fleet of barges on the right descending bank of the river, also just above MM 165 AHP. A larger ship, the M/V FORTUNE CLOVER, was anchored at the Burnside Anchorage slightly downriver of both the CENTURY DREAM and the JPE.

(15)

At all pertinent times, the Mississippi River was above flood stage and had a current of approximately 4-5 knots.

(16)

The captain of Captain Dragon and Pilot Bowman agreed that it would be best if the CENTURY DREAM, the faster and more maneuverable vessel, left the dock first to avoid the

need for an overtaking later in the day. Due to circumstances unrelated to the present case, the JPE was forced to leave before the CENTURY DREAM was able to depart.

(17)

At 10:27 a.m., the following communication took place:

> **CENTURY DREAM** – 59 JOHN PAUL.
>
> **JPE** – JOHN PAUL.
>
> **CENTURY DREAM** – Yea I'm sorry I didn't call you . . .
>
> **JPE** – Alright, well I'm going to go ahead and get out of here, you can get by me whenever.

(18)

At approximately 10:54 a.m., the JPE began her downriver journey. As Captain Dragon topped the flotilla around to begin his downriver journey, the head of his tow came within just a few feet of the forward port anchor chain of the FORTUNE CLOVER. The JPE did not allide with the FORTUNE CLOVER, and continued downriver.

(19)

The CENTURY DREAM began her downriver journey shortly thereafter at approximately 11:00 a.m.

(20)

At 11:18 a.m., the following communication occurred between Pilot Bowman and Captain Dragon:

> **CENTURY DREAM** – 59…. JOHN PAUL ECKSTEIN
>
> **JPE** – JOHN PAUL --
>
> **CENTURY DREAM** – I forgot where you said you was goin'. Where's your first stop at?

5

> **JPE** – Um, either Terre Haute Fleet or Reserve, I don't know. You know, just wherever they tell me to stop but, ah, I'm right above College here now, and I'm going to be backing up.
>
> **CENTURY DREAM** – Ah yeah, that's why I was checking with ya. We're just here up at Brilliant Point now in this little bitty spot, and I'ma start easing it back. Give me a holler when things look good down there. You have all kinds of time.
>
> **JPE** – All right, captain, thank you. I appreciate it.
>
> **CENTURY DREAM** – No problem, gotta get along.

(21)

After this communication, both vessels continued downriver.

(22)

At 11:35 a.m., the following communication takes place:

> **JPE**: JOHN PAUL ECKSTEIN to 59
>
> **CENTURY DREAM**: 59
>
> **JPE**: Where you getting to up there?
>
> **CENTURY DREAM**: Middle of St. James almost down to this first anchored ship.
>
> **JPE**: Ok, yeah, because I wanted to try and get you by before we get down there to St. Elmo. You know?
>
> **CENTURY DREAM**: Oh yeah, I am closing up the gap now. When you went out of sight down there, I came ahead on her. She will do about 17 to 18 in the straight aways.
>
> **JPE**: All right. I am easing ahead slow. In another five/ten minutes I should be around here [College Point].
>
> **CENTURY DREAM**: Good. I will be right on top of you right when you get below the [College] point. Just whatever way you want me to do is good.
>
> **JPE**: All right, well, let's take a look at it when I get around the point, okay?
>
> **CENTURY DREAM**: Yeah, no problem. I will go bank to bank.
>
> **JPE**: Roger, Roger.

6

>**CENTURY DREAM**: Even go through the drive thru today
>
>**JPE**: There you go, pick up some fries.

Captain Dragon tells Pilot Bowman that he wants the overtaking to take place before St. Elmo (ADM St. Elmo Elevator, which is located at approximately MM 150.4 AHP). Pilot Bowman informs Captain Dragon that he is reducing the gap between the two vessels and that the overtaking would take place right below College Point, which is located at MM 156.4 AHP.

(23)

At this time, Captain Dragon's Rose Point indicated that the expected overtaking would be just below College Point but above Chotin Light.

(24)

At all pertinent times, the JPE was the privileged vessel and the CENTURY DREAM was the burden vessel, given their points in the river.

(25)

As the privileged vessel, the JPE had the right and duty to direct the overtaking and to inform the CENTURY DREAM if the expected overtaking would pose a problem to the JPE. Nevertheless, Captain Dragon did not object to this proposal or indicate any potential issue with such an overtaking. Both vessels were monitoring their Rose Point system and each k new the location and speed of each vessel.

(26)

At 11:39 a.m., the following communication takes place between the JPE and the M/V/ HOUSTON, a tanker travelling upriver:

>**JPE**: JOHN PAUL ECKSTEIN to the northbound ship headed up on Chotin Light.
>
>**HOUSTON** (Pilot No. 21): No. 21 just turned up on the ranges at Belmont.

7

> **JPE**: Okay, captain, that's me flanking at College.
>
> **HOUSTON**: Gotcha, two whistles gonna be okay?
>
> **JPE**: Yeah, I hope so.
>
> **HOUSTON**: Well, I'm about dead stop right here, you're gonna be well around there. Waiting on all this to clear up. Thanks.

(27)

At 11:39 a.m., the CENTURY DREAM is still well upriver from College Point, the JPE is flanking at College Point, and the HOUSTON is approaching the lower end of the Belmont Fleet, nearer to the right descending bank. The Rose Point also showed both the CENTURY DREAM and the JPE where the CENTURY DREAM would be expected to overtake the JPE, and where the JPE would meet the HOUSTON.

(28)

Captain Dragon agreed to a two-whistle passing with the HOUSTON, and he continued to favor the left descending bank as he executed his flanking maneuver.

(29)

At 11:42 a.m., the following communication took place:

> **JPE**: 59?
>
> **CENTURY DREAM**: Go ahead . . . JOHN.
>
> **JPE**: Will one whistle work for you?
>
> **CENTURY DREAM**: You read my mind.
>
> **JPE**: Okay Captain, thank you.

(30)

At 11:42, the Rose Point continued to show the relative positions of the vessels. Since 11:39, the JPE had moved a little further from the left descending bank and a little further past College Point, and the HOUSTON still favored the right descending bank in preparation for its

8

meeting the JPE. The CENTURY DREAM remains above College Point. The point of overtaking was still accessible to both the CENTURY DREAM and the JPE.

(31)

In the 11:42 communication, the JPE, as the privileged vessel with the duty to arrange overtakings, directed the CENTURY DREAM overtaking of the JPE after College Point. In the 11:42 communication, Captain Dragon also completes his earlier promise – made at 11:18 a.m. – to contact CENTURY DREAM about the overtaking "when things look good down there," and the agreement made at 11:35 to look at in which manner the CENTURY DREAM should overtake the JPE (*i.e.,* one-whistle or two-whistle) when he got "around the point." As the captain of the privileged vessel with the right and duty to direct the overtaking, Captain Dragon either considered his vessel to be sufficiently "around the point" or failed in his duty to engineer a safe and satisfactory overtaking.

(32)

At approximately 11:45 a.m., ten minutes after Captain Dragon indicated he would be around College Point in 5-10 minutes, the CENTURY DREAM approached the JPE and told the JPE that there was "plenty of room" for the overtaking, to which the JPE responded, "Roger that." The CENTURY DREAM, as the burden vessel, was only required to stay clear of the JPE and its tow. In leaving "plenty of room," the CENTURY DREAM fulfilled its obligation under Rule 13 of the Inland Navigation Rules.

(33)

At 11:46 a.m., the CENTURY DREAM overtook the JPE below College Point, staying well clear of the JPE.

(34)

After the CENTURY DREAM passed the JPE, the eddy near the left descending bank began pushing the JPE and its tow toward Belmont Fleet.

(35)

At approximately 11:49 a.m., the JPE's forward barge in the 2-barge string on the port side of the tow allided with one of the barges in Belmont Fleet, resulting in damage.

(36)

At the time of the allision, the CENTURY DREAM was well downriver from the JPE.

(37)

Captain Dragon was, at all pertinent times, aware of and familiar with the fact that there was an eddy located near the left descending bank below College Point.

(38)

The CENTURY DREAM did not pass too closely to the JPE when overtaking, nor did the CENTURY DREAM's wake or suction impact the JPE in any way or cause the JPE's allision.

(39)

Chotin Light, located at MM 155.6, is almost exactly one mile below College Point and is a well-known navigational landmark. As the captain on the privileged vessel, had Captain Dragon wanted to delay overtaking until after he passed Chotin Light, he could have so specified. He did not.

(40)

At no time did Captain Dragon indicate to Pilot Bowman that he believed the CENTURY DREAM was proceeding too fast or was too close, or that the overtaking was different than planned or being executed in an unsafe manner.

(41)

At no point in time did Captain Dragon ever sound a danger whistle to warn vessels and/or people in or around Belmont Fleet that there was a potential for a collision.

(42)

At no point in time did Dragon call any of the nearby tugs to request assistance in pushing the head of his tow away from Belmont Fleet to avoid a collision.

### III. CONCLUSIONS OF LAW

(1)

Federal Courts are courts of limited jurisdiction. "A party may neither consent to nor waive federal subject matter jurisdiction." *Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999). This case arises under the Court's admiralty and maritime jurisdiction. Fed. R. Civ. P. 9(h).

(2)

The Inland Navigation Rules govern the conduct of vessels navigating in this portion of the Mississippi River. 33 C.F.R. § 83.01.

(3)

To establish negligence under General Maritime Law, the plaintiff bears the burden of proving by a preponderance of the evidence that: (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; (3) the plaintiff sustained damages; and (4) the breach caused the plaintiff's alleged damages. *See Canal Barge Co. v. Turco Oil Co.*, 220 F.3d 370, 376 (5th

Cir. 2000). "The applicable standards of care in a collision case stem from the traditional concepts of prudent seamanship and reasonable care, statutory and regulatory rules, and recognized customs and uses." *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 364 (5th Cir. 2006).

(4)

In this case, the JPE was the privileged, or stand-on vessel with respect to the planned overtaking by the CENTURY DREAM. *See*, *in re Mid-South Towing Company*, 418 F.3d 526 (5th Cir. 2005). As the privileged vessel, it was incumbent upon JPE's captain to propose the manner and place of passing. *Id*. As the privileged vessel, if JPE did not agree with any of the proposed overtaking agreements, Captain Dragon had the right and obligation to either deny the overtaking or to propose an overtaking which could be performed safely and which would allow him to maintain control over the JPE and its flotilla.

(5)

Rule 13 of the Inland Navigational Rule provides, in pertinent part: ". . . any vessel overtaking any other shall keep out of the way of the vessel being overtaken." In this case, the Court finds that the CENTURY DREAM complied with Rule 13 and kept well out of the way of the JPE.

(6)

Rule 34(c) of the Inland Navigational Rule provides, in pertinent part: "When in sight of one another…a power-driven vessel intending to overtake another power-driven vessel shall indicate her intention by the following signals on her whistle: One (1) short blast to mean "I intend to overtake you on your starboard side. . . ." Rule 34(h) goes on to provide: "A vessel that reaches agreement with another vessel in a head-on crossing, or overtaking situation, as, for

12

example, by using the radio . . . is not obligated to sound the whistle signals prescribed by this rule, but may do so." In this case, the Court finds that CENTURY DREAM and JPE entered into a onewhistle overtaking agreement, and that CENTURY DREAM complied with its obligation as the give-way or burden vessel.

(7)

Rule 34(d) provides:

> When vessels in sight of one another are approaching each other and from any case either vessel fails to understand the intentions or the actions of the other, or is in doubt whether sufficient action is being taken by the other to avoid collision, the vessel in doubt shall immediately indicate such doubt by giving at least five (5) short and rapid blasts on the whistle. This signal may be supplemented by a light signal of at least five (5) short and rapid flashes.

In this case, the JPE never sounded any danger whistles. Accordingly, this Court finds that, Captain Dragon either did not comply with Rule 33(d) or did not perceive that there was any problem with the overtaking or any real risk of allision with the Belmont Fleet.

(8)

Further, the tone of all radio communications between Captain Dragon and Pilot Bowman was cordial, relaxed, and, at times, joking. There was never any indication that either the captain or pilot were worried or sensed anything was awry.

(9)

While the National Transportation Safety Board ("NTSB") have recommended that overtaking in sharp bends should be avoided, especially during high water conditions, NTSB Safety Recommendations are recommendations and not binding rules on vessels or their crews. *See* National Transportation Safety Board, Safety Recommendation M-99-23 (February 17, 2000) ("The Safety Board continues to view the practice of deep draft vessels meeting or overtaking other vessels at channel bends to be highly dangerous."). In the instant case, the

13

privileged vessel orchestrated an overtaking after College Point but not in a straightaway. If Captain Dragon had considered it unsafe to do so, he had the duty to alert Pilot Bowman and suggest an alternative overtaking. This Court does not find that Pilot Bowman was negligent in following through with the agreed-upon overtaking, and was not responsible for the JPE's allision.

(10)

The JPE, as the privileged vessel, had the right and duty to orchestrate a safe overtaking or, if a safe overtaking is impossible, to inform the overtaking vessel that no overtaking may occur. The JPE, through Captain Bowman, did not do so in this case. This failure was a breach of duty which caused the allision.

### IV. SUMMARY

On the basis of the above Findings of Facts and Conclusions of Law, the Court finds that Captain Dragon failed to properly account for the known eddy on the left descending bank below College Point, and failed to take appropriate steps to control the flotilla so as to avoid the allision. As such, the Court finds that the proximate cause of the JPE's allision was the navigational decisions of JPE, not any negligence on the part of CENTURY DREAM.

New Orleans, Louisiana this 21st day of February, 2017.

*Eldon E. Fallon*
UNITED STATES DISTRICT JUDGE